Michael Simpson **WILSON, Appellant,**

v.

The **STATE of Oklahoma, Appellee.**

**No. F–74–691.**

Court of Criminal Appeals of Oklahoma.

May 21, 1975.

Rehearing Denied June 6, 1975.

Carroll Samara and Lawrence H. Mc-Millin, Oklahoma City, for appellant.

Larry Derryberry, Atty. Gen., James L. Swartz, Asst. Atty. Gen., David O'Brien, Legal Intern, for appellee.

## OPINION

**PER CURIAM:**

Appellant, Michael Simpson Wilson, hereinafter referred to as defendant, was charged, tried and convicted in the District Court, Cleveland County, Case No. CRF–73–486, for the offense of Burglary in the Second Degree, After Former Conviction of a Felony, in violation of 21 O.S.1971, § 1435. The jury fixed his punishment at ten (10) years' imprisonment, and from said judgment and sentence a timely appeal has been perfected to this Court.

The State's first witness at trial was the complainant, Paul Frolich, who testified that from Friday, November 9, 1973, to

Sunday, November 11, 1973, he and his wife were in Columbia, Missouri, and their children were staying with their grandparents. The complainant testified that he left his residence, 37 S.W. 101st, Oklahoma City, Oklahoma, unoccupied, and he further testified that he was the last to leave the house and that the windows and doors were locked and shut. When he returned to his home after the weekend, the television set was mislocated, clothes previously hanging in the closet were found laying across the bed, the suitcases were down from the closet, and the sewing machine was mislocated, all of which was substantially different from the way he left it. The complainant also testified that the back stormdoor had been sprung and a hole had been forced into the back door, and several pry marks were evident around the door.

The State's next witness, Jim Cochran, lived across the street from the complaining witness. He testified that at approximately 4:00 A.M. on Saturday, November 10, 1973, he was awakened by the dogs in the neighborhood. He looked out the window and watched a man on the complainant's driveway walk up to the front door, and then he testified that the man went back around the house to the side and jumped over the fence going into the back yard. The witness, at that time, called the police. The witness was unable to make an identification of the man he saw.

The State's next witness was an officer of the Oklahoma City Police Department, William Pierce, who was the first officer to arrive at the Frolich's home. According to his testimony, at approximately 4:08 A.M. Saturday, November 10, 1973, he received a call to check out a report of a burglary at the residence of the complaining witness. He arrived at the scene in his marked patrol car with his lights off, and pulled into the drive at an angle. He left his patrol car and walked around to the back of the complainant's residence where he noticed the storm door was propped open. At this time his backup unit arrived with Officers Harmon and Enger. Pierce, the witness, and Enger stayed in front while Officer Harmon went to the back. Pierce went to the front door and Enger peered through the picture window at the front of the house. Pierce rang the doorbell and Enger saw the defendant running through the house. At that time, Pierce testified that Enger went to the back of the house and he, Pierce, took position in the yard. In a few moments someone attempted to open the front door, but slammed the door when Officer Pierce shined his flashlight at the front door entrance. The witness then testified that he heard a gunshot at the back and he immediately ran to the back where he observed Officer Harmon scuffling with someone. The officer was unable to hold onto the person, who broke away and continued running from the officer and went between two houses behind the burglarized residence. Officer Pierce, who saw the way the defendant was running, cut between two houses, intercepted and apprehended the defendant. Pierce testified that even though he lost sight of the defendant while he ran between the houses, he could identify the defendant as the same man he saw wrestling with Officer Harmon.

Officer Enger, the State's next witness, testified that when he left the front after observing the defendant through the picture window he went to the back of the residence, entered the house through the propped-open screen door and therein saw the defendant, Michael Simpson Wilson. He testified that there was a brief chase in the house at which time the defendant avoided Officer Enger and ran out the back door. Officer Enger ran to the back door in time to see the defendant and Officer Harmon scuffling, at which time the defendant broke loose. Enger further testified that he saw the defendant run between two houses where he lost sight of the defendant. In a few moments, however, Officer Pierce had apprehended the same

man that Enger had seen in the house, the defendant, Michael Simpson Wilson.

Officer Pierce also testified that he found a screwdriver in the rear pocket of the defendant and found a golf-type cap, a pair of brown gloves, and a ski mask in defendant's coat pocket. Officer Enger testified that when he entered the house the defendant had on a golf-type hat, the same as the one that Officer Pierce found on the defendant's person.

Thereafter the State rested.

The defense called the defendant, Michael Simpson Wilson, to the stand. The defendant testified that he had been at a bar the night of the alleged burglary and when the bar closed at 2:00 A.M., he left. He further testified that a man needed a ride from the bar and that he gave the man a ride to his mother's home. After that, he went to a Git 'n Go at 102nd and Santa Fe. He testified that it was about 3:00 A.M. when he got to the store, which was already closed. He maintained that he got out of his car because it was overheated, and he was unable to get the car started again. At this point, the defendant testified that he began to walk to a friend's house which took him down 100th Street. He testified further that as he approached Broadway at 100th Street an officer came from between two houses and told him to lie down and be still, which he immediately did. The defendant denied being in the burglarized residence, and also denied having on his person the screwdriver, the gloves, the cap and the ski mask.

The defense also called as witnesses, Lee Patterson, president of the Lions Club of which defendant was a member, and Ron Armatage, a realtor who had dealt with the defendant. Both of these witnesses testified as to the good character of the defendant.

During the direct examination of the defendant, his attorney asked the defendant if he had ever been in trouble before, to which the defendant replied that he had been convicted of burglary out of Tulsa County. On cross-examination by the prosecuting attorney, the State presented evidence of two former convictions, one for Knowingly Receiving Stolen Property, and the second for Burglary in the Second Degree. The defendant admitted the convictions, and testified that he was the same person as the Michael Simpson Wilson convicted on both of those charges.

Also on the direct examination, he admitted that on the night in question he had been drinking alcoholic beverages in the bar to which he referred. On cross-examination, the prosecution asked the defendant, who was on parole for his prior conviction, if it was a violation of his parole to drink alcoholic beverages in a bar. The defense counsel objected, and was overruled, and the defendant answered that the drinking was a violation of his parole.

 The defendant alleges as his first assignment of error that the trial court committed fundamental, prejudicial error in failing to instruct the jury as to the limited purposes for which evidence of defendant's prior convictions was admitted into evidence. In this respect the defendant asserts that it was an absolute necessity for the jury to understand the purpose of the evidence of the prior convictions. Generally, evidence of prior convictions may be admitted into evidence for two purposes: to bear directly on the credibility of the defendant; and, for the purpose of enhancing punishment. The defendant contends that it was fundamental error for the court not to instruct, without request, as to the limited purpose of showing prior convictions. In support of his first assignment of error, the defendant cites Matchen v. State, Okl.Cr., 349 P.2d 28 (1960). In *Matchen,* supra, where the prosecutor presented evidence of prior convictions of reckless driving, this Court stated that it was fundamental error for the trial court not to instruct as to the limited purpose of the evidence of former convictions. However, there is one distinguishing factor which is of significant impact, that being, in *Matchen,* supra, the defendant offered his

requested instructions to the trial court, as opposed to the instant case wherein there were neither requested instructions nor objections to the instructions given.

The defendant also cites Jordon v. State, Okl.Cr., 327 P.2d 712 (1958). However, in *Jordon,* supra, the court included in the instructions details of the prior convictions but *nowhere else* in the instructions was the jury advised of the purpose of the evidence of conviction. This case is not in point with the instant case.

We feel compelled to follow this Court's holding in Norton v. State, Okl.Cr., 492 P. 2d 359 (1971), wherein we held that the defendant's attempt to raise for the first time on appeal the proposition that the trial court erred by not giving limiting instructions of the former convictions was untimely. The *Norton* case involves a charge of larceny after prior conviction of a felony, in which the defendant neither objected to, nor offered alternative instructions as to the limited purpose of the evidence of prior convictions. Also in accord with *Norton,* supra, is French v. State, Okl.Cr., 501 P.2d 853 (1972). In *French,* supra, this Court held that failure to instruct as to the limited purpose of the evidence of prior convictions was not reversible error where the defendant was the first to introduce the evidence of prior convictions, and where the defendant failed to request the desired instructions. In the instant case, as in the *French* case, the defendant first introduced the evidence of his prior conviction and also, as aforementioned, failed to request the desired instructions.

In light of defendant's failure to request the desired instructions, coupled with the fact that the court's instructions were clear and unambiguous and that evidence of guilt was overwhelming, we hold that defendant's first assignment of error is without merit.

■ The defendant contends as his second assignment of error that the prosecuting attorney, on cross-examination, asked improper questions as to a particular act bearing on defendant's character, and that the trial court erred in not sustaining defendant's objections thereto. Specifically, defendant alleges as improper the cross-examination of defendant by the prosecuting attorney as to whether or not the drinking of alcoholic beverages was a violation of parole. In Murphy v. State, 72 Okl.Cr. 1, 112 P.2d 438 (1941), this Court stated, as follows:

"It is not error alone that reverses judgments of conviction of crime in this state, but error plus injury, and the burden is upon the plaintiff in error to establish to this court the fact that he was prejudiced in his substantial right, by the commission of error . . ."

In view of the fact that the jury fixed the minimum sentence of ten (10) years when the evidence of guilt was overwhelmingly clear, we cannot see where, or by what evidence, the appellant has shown the existence of prejudice. In Green v. State, Okl.Cr., 481 P.2d 805 (1971), this Court held that where the defendant's guilt was strongly established by evidence, arresting officer's testimony that he had known defendant for seven or eight years and had helped confine him several times in county jail did not constitute such prejudicial error as would entitle defendant to a new trial, but justice would best be served by modifying sentence of fifteen (15) years' imprisonment to a term of ten (10) years' imprisonment. However, in the instant case, the jury, as aforementioned, assessed the minimum sentence of ten (10) years.

Also, in the instant case, the defendant himself, in response to questions by his own counsel, admitted that he had been drinking at the bar the night of the burglary. The question concerning drinking as a parole violation hardly appears to be such an additional sting to the character of the defendant when taken into consideration that the defendant had already admitted guilt to another burglary. We, therefore, find that the appellant has stated no error

which will serve as grounds for reversal as to the second specification of error.

In conclusion, we observe that the record is free of any error which would justify modification or reversal. The judgment and sentence is, accordingly, affirmed.